United States District Court
Southern District of Texas
**ENTERED**
May 18, 2016
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **FRED A. FULLER,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. B: 13-109** |
| | § | |
| **BROWNSVILLE INDEPENDENT** | § | |
| **SCHOOL DISTRICT, ET AL.,** | § | |
| **Defendants.** | § | |

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On June 7, 2013, Plaintiff Fred A. Fuller ("Fuller") sued the Brownsville Independent School District ("BISD"), Catalina Presas-Garcia, Lucy Longoria, Christina Saavedra, Enrique Escobedo[1], Sylvia Atkinson, and Carl Montoya. At the time of the events in question in this case, Presas-Garcia, Longoria, Saavedra, and Escobedo were members of the school board; Montoya was the BISD superintendent and Atkinson was an administrator.

On November 10, 2015, all of the defendants filed motions for summary judgment in this case. Dkt. Nos. 68, 70. Fuller has filed a response and Defendants have filed replies. Dkt. Nos. 92, 93, 94.

After reviewing the record and the relevant case law, the Court recommends that the motions for summary judgment be granted. Fuller has failed to submit evidence showing a genuine dispute of material fact that he is entitled to relief under any of his claims.

---

[1] Since the filing of the complaint, Escobedo has passed away. Laura B. Martinez, Police: BISD Board Chair Enrique Escobedo Jr. dead, Brownsville Herald, Dec. 19, 2013. Fuller has not amended his complaint to seek relief against Escobedo's estate. For purposes of this report and recommendation, the Court will assume that Fuller could seek relief against Escobedo's estate and will refer to Escobedo and his estate as "Escobedo."

1

## I. Background

### A. Factual Background

In 1983, Fuller was hired by BISD as a staff accountant. Dkt. No. 92-1, p. 13. Approximately three or four years later, Fuller was promoted to accounting supervisor. Id, pp. 18-19.  In 1994, Fuller was again promoted, this time to budget administrator for BISD. Id, pp. 20-21.  In that position, Fuller was responsible for "[a]ll of the functions of budgeting for the Brownsville School District.  From the onset, meeting with all campus principals, all department administrators, cabinet, superintendent, and processing all budgets for the subsequent fiscal period." Id, pp. 20-21.  These duties included ensuring that departments submitted timely budgets that conformed with various budgeting rules (the availability of carryover funds, ensuring that federal and state monies were used in accordance with federal and state laws, etc.).

Beginning around 2006 or 2007, Fuller began interacting with Art Rendon, who was the director of special services for BISD. Dkt. No. 92-1, pp. 30-31.  Rendon would routinely submit preliminary budgets that exceeded his budgetary allowance for that fiscal year. Id. A hypothetical provided by Fuller was that Rendon was given a budgetary allowance of 10 million dollars, but Rendon would turn in a budget for 14 million dollars. Id, pp. 32-33. Then, when forced to reduce his budget to meet the allowance, Rendon would "turn in a budget that had zero operating costs [for things] such as consultants, supplies and material, travel and some capital outlay." Id.  After that budget was approved, Rendon would come back "three or four months later" and submit a budgetary amendment to obtain additional funds for the operating costs that he had previously zeroed out. Id, pp. 47-51.  The BISD board would then approve the amendment, authorizing the additional funds. Id, pp. 47-51. In essence, according to Fuller, Rendon was manipulating the budgetary process to secure additional funds for his department.  Fuller wanted Hector Gonzales – the then-BISD superintendent – to take disciplinary action against Rendon for his budgetary actions; Gonzales refused. Id, pp. 54-55.

In late 2008 or early 2009, Fuller was informed by Robert Reese, the then-interim Chief Financial Officer ("CFO") for BISD – that, "based on directives from Hector Gonzales," Fuller was "to refrain from anything that had to do with special services." Dkt. No. 92-3, pp. 52-53.  In effect, Fuller was cut out of the special services budgeting process; his "entire role with regard to Mr. Rendon's portion of the budget was just to enter whatever other people had agreed to." Id, p. 53.

Around this same time, Rendon submitted several invoices that did not include a purchase order – in violation of BISD financial policies. Dkt. No. 92-1, pp. 55-58.  Rendon also submitted invoices for payments on behalf of special services, despite the fact that the department lacked the necessary operational funds. Dkt. No. 92-1, p. 57.  When Fuller spoke to Gonzales about these issues, Gonzales indicated that he was disappointed in Fuller for "not paying [the invoices] and just letting it go." Id, pp. 58-59.

Shortly after this, Gonzales and Rendon were placed on administrative leave and their employment contracts were not renewed. Dkt. No. 92-1, p. 62.[2]  In January 2009, Brett Springston, who had previously served as an area administrator for BISD, was named the interim superintendent to replace Gonzales. Id, p. 62.

Gonzales contested his placement on administrative leave, filing a grievance. Dkt. No. 92-1, p. 64.  As part of Gonzales's grievance process, Fuller gave a deposition on July 21, 2009, describing "the problems [Fuller] had with Mr. Rendon's budgets and then the details of [his] interactions" with Gonzales, Cavazos, and Rendon.  Id, p. 66.  Fuller specifically noted the period in which he was "pulled out" of the special services budgetary process. Id.  Fuller also testified about what he deemed to be "invoices that were incurred without a properly authorized purchase order," as well as Gonzales's refusal to discipline Rendon for submitting the invoices. Id, p. 66; Dkt. No. 70-4 (transcript of Fuller's deposition for Gonzales's grievance hearing).

---

[2] The Court notes that Gonzales and Rendon each sued BISD for unlawfully terminating their employment. Gonzales v. BISD, Civil No. 1:11-237, Dkt. No. 1 (S.D. Tex. 2011); Rendon v. BISD, Civil No. 1:10-198, Dkt. No. 1 (S.D. Tex. 2010).  Each of these cases settled prior to trial.

In March 2010, Fuller was hired by BISD as the permanent CFO. Dkt. No. 92-1, p. 27. This promotion took place after Fuller gave his deposition as part of Gonzales's grievance proceedings. Id, p. 70. No one was hired to replace Fuller as budget administrator; he kept those job duties, in addition to his new duties as CFO. Id, p. 74.

Fuller was given, what was colloquially known as, a "non-Chapter 21" contract for his CFO position. Dkt. No. 92-1, p. 270. Texas Education Code chapter 21 provides protections for teachers, giving them an expectation of continued employment, absent resignation, retirement, or termination for misconduct. TEX. ED. CODE § 21.154. Fuller was not given these protections in his contract; hence, the "non-Chapter 21" designation. Fuller's contract specifically stated that BISD "may suspend [Fuller], with pay, at any time during this contract at the District's sole discretion." Dkt. No. 92-1, p. 271.

According to Fuller, after the school board elections in November 2010, some of the new board members got together with the existing board members and came up with a list of BISD employees that they wanted to "get rid of." Dkt. No. 92-1, pp. 85-90. Fuller testified that Presas-Garcia, Longoria, Saavedra, and Escobedo were the BISD board members – at the time – who came up with the list. Id, p. 89. Fuller testified that both he and Springston were on the list of people to be removed. Id, p. 88. Fuller also testified that this group "got rid of me for retaliation and my affiliation with other individuals that were not their supporters." Id, p. 98.

On June 8, 2011, Springston resigned as the BISD superintendent. Dkt. No. 92-1, p. 102. On that same day, Carl Montoya was named the interim superintendent. Id.

Montoya had previously served as an area administrator for BISD. Dkt. No. 70-5, p. 7. In that role, Montoya says that he heard complaints from several people about Fuller's job performance. Id, pp. 6-7. Montoya said that in his role as an area administrator, he "couldn't go to [Fuller] and say correct this or else," because he did not have any authority over the CFO. Id, p. 7.

On June 9, 2011 – the day after he was appointed the interim administrator – Montoya

4

walked into Fuller's office and asked Fuller whether he "was ready to present at the budget committee meeting of the 10th or 11th." Dkt. No. 92-1, p. 103.  Fuller responded that he had "nothing to present," because he was not scheduled to present anything, and that other budgetary officials were scheduled to make presentations. Id, p. 103.  At that point, Montoya walked out of Fuller's office. Id, pp. 103-104.

Fuller did not see Montoya again until 3:15 p.m. that same day, when Montoya and Ismael Garcia – the special programs administrator – entered Fuller's office. Dkt. No. 92-1, pp. 106-107.  Montoya handed Fuller a letter – the substance of which was that Fuller was being placed on administrative leave – and told Fuller to read it. Id, pp. 107-108.

Fuller replied, "Sir, I mean, why [are] you putting me on leave?" Dkt. No. 92-1, p. 108.  Montoya responded, "This is what the board wants." Id, p. 108.  Fuller claims to have responded, "But what you do want?" Id, p. 108.  Montoya replied, "Tony, this is what the board wants." Id, p. 108.  Montoya then informed Fuller that Garcia was going to be the interim CFO. Id, p. 109.

Effective that day – June 9, 2011 – Fuller was placed on administrative leave with full pay and benefits. Dkt. No. 92-1, p. 111.  Montoya stated at his deposition that Fuller was placed on administrative leave so BISD "could investigate to see if these allegation[s]" of misconduct "were true." Dkt. No. 70-5, p. 7.  Montoya noted that there had been insufficient funds to cover the checks for three purchase orders that totaled over $700,000. Id, p. 7.  Montoya also noted that a total of "134 checks that bounced because of, and I'm going to say it, mismanagement." Id, p. 7.  Montoya stated under oath that at the time that he placed Fuller on leave, he did not know that Fuller had testified against Gonzales.[3] Id, p. 9

In June 2011, Fuller filed a grievance – as allowed by BISD policy – contesting his placement on administrative leave. Id, p. 112.  In late July 2011, Fuller was called into the

---

[3] Montoya testified that he was unaware of Fuller's deposition in Gonzales's grievance process, until Montoya read about it in Fuller's amended complaint in this case – which was filed on September 20, 2013. Id, p. 9.

office of Sylvia Atkinson, the interim human resources officer for BISD, and was given a letter and informed that BISD was abating the grievance process. Id, p. 113.  Fuller retained his right to a Level II and a Level III grievance; the former is a hearing in front of a BISD school official; the latter is a hearing before the entire BISD board of trustees.

In July 2011, BISD entered into a contract with Defenbaugh and Associates to conduct a forensic audit of BISD finances. Dkt. No. 70-5, p. 20.

In January 2012, Atkinson offered Fuller his choice of two jobs: financial director of food service or as a bi-tech specialist. Dkt. No. 92-1, p. 117.  The latter position is a computer programming position and Fuller stated that "by nature, I am not a computer programmer." Id, p. 117.  Fuller told Atkinson he would take the financial director of food service position, even though it would result in a pay decrease. Id, pp. 117-118.  On January 23, 2012, when Fuller reported for duty in his new food service position, Atkinson gave him another letter. Id, pp. 117-118.  In this letter, Fuller was informed that Montoya had changed his mind and that Fuller was not to return to work. Id.

On February 15, 2012, Defenbaugh presented the audit to the BISD school board at a closed meeting.  As it related to Fuller, the audit stated that "Forensic Audit Staff arrived at the opinion that Mr. Fuller did not possess the competencies in both faculties and capabilities necessary for the position of BISD CFO." Dkt. No. 92-1, p. 274.

The audit found that in 2006, nearly 6 million dollars in fixed assets were not properly accounted for and that Fuller – who was the budget administrator at that time – responded that the amount "was not material" in comparison to the overall BISD budget. Dkt. No. 92-1, p. 274.  The audit also noted that in May 2010, three checks – which totaled over $700,000 – were returned for insufficient funds. Id, p. 274.  The audit further noted that Fuller transferred funds of over $47,000 into the wrong account, in violation of state and BISD policies; the audit noted that this failure may even merit criminal charges.[4]

_____

[4] The referenced section provides "[a] person who fails to comply with the person's duties with regard to the preparation or the following of a county school budget or a budget of a

6

The audit also stated that Fuller failed to brief the BISD about changes in Texas Education Agency rules regarding debt service for school bonds, which resulted in the BISD board being "blindsided." Id, p. 274.   In essence, the Texas Education Agency changed the rules regarding debt service of bonds.   Previously, the entire debt service of a bond was eligible for funding; under the new rules, only the net debt service would be eligible for funding. Id, p. 278.   Because of this change, BISD would pay an additional $9 million – spread over an 18-year term – to retire the bonds.  Id.   According to the audit, BISD's financial advisor informed Fuller of this possible change, but Fuller did not inform the board of trustees.  Id.

On February 16, 2012 – the next day – the audit report was released to the Brownsville Herald, the local general circulation newspaper. Dkt. No. 92-1, p. 137.

On April 4, 2012, the BISD board of trustees sent Fuller a letter, informing him that Montoya – who was the interim superintendent at this point – had recommended to the board that Fuller's contract not be renewed for the following school year. Dkt. No. 92-1, pp. 125-126.

On May 3, 2012, Fuller had a Level II grievance hearing in front of Sandra Lopez, who was an area superintendent for BISD. Dkt. No. 92-1, p. 132.   Fuller described the hearing as "pretty much orchestrated. They heard us, heard them, rubber stamp, denied." Id, p. 132.  Lopez found that there was no factual basis for Fuller's retaliation claim. Id, p. 133.

On June 19, 2012, Fuller had a Level III grievance hearing in front of the entire BISD board of trustees. Dkt. No. 92-3, pp. 133-134.  At that hearing, Fuller's attorney was given a few minutes to argue against the termination and to point out alleged improprieties, by BISD officials, in how they handled Fuller's placement on administrative leave. Id, pp. 136-138.   After that, Atkinson addressed the alleged improprieties. Id, pp. 137-138.  Fuller's

---

school district or who violates any provision of Section 44.002 commits an offense.  An offense under this subsection is a Class C misdemeanor." TEX. EDUC. CODE § 44.052(b).  The Court has found no record of any person in Texas ever being prosecuted for this crime.

attorney then gave a short rebuttal. Id.  Some BISD board members asked Atkinson a few questions to clarify some issues. Id, pp. 137-138.

At the conclusion of the hearing, the BISD board voted to deny Fuller's grievance. Dkt. No. 92-1, p. 140.  Fuller's contract was not renewed for the following school year.  In this case, Fuller has maintained that his 2009 deposition in the Gonzales grievance was the reason for the non-renewal of his contract.

Fuller, in a 2015 deposition[5] for the instant case, was asked "is there anything in particular that you said during that [2009] deposition [in the Gonzales grievance process] that you believe you were retaliated against for saying?" Dkt. No. 92-1, p. 67.  Fuller responded, "I think the [2009] deposition in itself against Art Rendon, against Hector Gonzales, their ties to other individuals, their supporters, we also had a board member that testified [for] Hector Gonzales," identifying Presas-Garcia as that board member. Id, p. 67.

Later in the 2015 deposition Fuller also stated that there were other reasons that he was retaliated against beyond his testimony at the 2009 deposition for the Gonzales grievance hearings. Dkt. No. 92-1, p. 161.  These reasons included, but were not limited to: recommending a different bank for BISD's financial services than the one that the board ultimately chose to use; a mix-up regarding a bond issue; and a bounced check. Id, p. 161.

### B. Procedural History

On June 7, 2013, Fuller filed a complaint against Defenbaugh, BISD, Presas-Garcia, Longoria, Saavedra, Escobedo, Atkinson, and Montoya. Dkt. No. 1.

On August 20, 2013, BISD, Presas-Garcia, Longoria, Saavedra, Escobedo, Atkinson and Montoya filed a motion to dismiss. Dkt. Nos. 6-9.

On September 20, 2013, Fuller filed his first amended complaint. Dkt. Nos. 21, 24. Six days later, on September 26, 2013, Fuller filed an unopposed motion for leave to file a second amended complaint, which the Court granted. Dkt. Nos. 25, 28.  In granting the

---

[5] This deposition was conducted on April 27, 2015, as part of the instant litigation. Dkt. No. 70-3.

motion, the Court dismissed– as moot – the earlier complaints and motions to dismiss. Dkt. No. 28.

In the second amended complaint, Fuller asserts federal claims for (1) conspiracy pursuant to 42 U.S.C. § 1985, and (2) retaliation and denial of due process, pursuant to 42 U.S.C. § 1983. Dkt. No. 29.  Fuller also made state law claims for (3) defamation/ slander/libel; (4) tortious interference with contractual relationship; (5) intentional infliction of emotional distress; and (6) civil conspiracy. Id.

On October 11, 2013, Defenbaugh filed a motion to dismiss. Dkt. No. 30.  On February 6, 2014, that motion was granted. Dkt. No. 42.  The federal claims against Defenbaugh were dismissed for failure to state a claim upon which relief can be granted; the state law claims were dismissed without prejudice to refiling in state court. Id.

On May 11, 2015, BISD filed a motion to dismiss all of the state law claims against Presas-Garcia, Longoria, Saavedra, Escobedo, Atkinson, and Montoya. Dkt. No. 58.  On January 20, 2016, that motion was granted in part and denied in part.  As to Montoya and Atkinson, the motion was granted and all state law claims against them were dismissed. Id. As to Presas-Garcia, Longoria, Saavedra, and Escobedo, the motion to dismiss was denied.

Between the time that BISD moved to dismiss the state claims against the individuals and the Court's ruling on that motion, Presas-Garcia and Longoria filed – on November 10, 2015– a motion for summary judgment. Dkt. No. 68.  In that November motion, Presas-Garcia and Longoria assert that Fuller's claims fail for the following reasons: (1) the First Amendment retaliation claim fails because they were unaware of Fuller's testimony against Gonzales when they made the decision to not renew Fuller's employment; (2) Fuller was given all of the constitutionally-protected process that he was due; (3) Fuller has not identified "any specific defamatory statements" made by either of them; (4) Fuller's employment contract was not breached, for which reason there can be no tortious interference with that contract; (5) Fuller's intentional infliction of emotional distress claim is barred as a matter of law; (6) there is no genuine dispute of material fact as to the civil

conspiracy claim; and (7) both Presas-Garcia and Longoria are entitled to official and qualified immunity for their actions as BISD trustees. Dkt. No. 68-1.

On that same day – November 10, 2015 – BISD, Saavedra, Escobedo, Montoya, and Atkinson also filed a motion for summary judgment. Dkt. No. 70. This motion for summary judgment sets forth arguments similar to those raised by Presas-Garcia and Longoria. Dkt. No. 70-1. This summary judgment motion, however, also asserts legislative immunity as to all federal causes of action. Id.[6]

On March 7, 2016, Fuller timely filed an omnibus response to the two motions for summary judgment. Dkt. No. 92. As to the federal claims, Fuller asserts that he has stated a valid claim for retaliation based on his First Amendment political associations and that he was denied proper due process under the Fourteenth Amendment. Id. As to the state law claims, Fuller asserts that (1) he was defamed when the defendants published the Defenbaugh audit to the local media; (2) the defendants interfered with his contract; (3) Presas-Garcia and Longoria engaged in unspecified "extreme and outrageous acts," causing the intentional infliction of emotional distress; and (3) the defendants engaged in civil conspiracy. Id. Fuller also asserts that the defendants are not entitled to immunity of any kind.

As part of their summary judgment evidence, Fuller included a sworn affidavit from Richard Zayas, a former BISD trustee, and excerpts from a videotaped deposition of Mary Rey, in an unrelated state court case. Dkt. Nos. 92-5, 92-6. According to the summary judgment response, Rey appears to claim that she was present at meetings where Presas-Garcia and Longoria conspired to terminate Fuller's employment. Dkt. No. 92, p. 3. The Rey deposition does not include a certificate from a court reporter certifying that the deposition

---

[6] Legislative immunity does not appear to be applicable to the instant case. Legislative immunity does not cover "administrative" actions; an administrative action is one that "singles out specific individuals and affects them differently from others." Hughes v. Tarrant Cty. Tex., 948 F.2d 918, 921 (5th Cir. 1991). Given that the complained-of actions in this case were directly solely at specific individuals, they were administrative in nature and not protected by legislative immunity.

is true and correct.

On March 14, 2016, Defendants filed reply briefs. Dkt. Nos. 93, 94.  Defendants specifically objected to the Zayas affidavit as being "riddled with conclusory statements and rank speculation," as well as being "irrelevant to any issue presented in this lawsuit." Dkt. No. 93, p. 4.  They also objected to the Rey deposition; noting that it was not produced in the initial disclosures; no transcript of the testimony has been produced; and that there was no way to "decipher the citations" to the video. Id.[7]

## II. Applicable Law

### A. Summary Judgment

Summary judgment is appropriate when the moving party has established that the pleadings, depositions, answers to interrogatories, admissions, and affidavits – if any – demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  A genuine issue is "real and substantial, as opposed to merely formal, pretended, or a sham." Bazan v. Hidalgo Cnty., 246 F.3d 481, 489 (5th Cir. 2001).  A material fact is one that might influence the outcome of the suit. Id.  Accordingly, a "genuine issue of material fact exists where evidence is such that a reasonable jury could return a verdict for the non-movant." Piazza's Seafood World, L.L.C. v. Odom, 448 F.3d 744, 752 (5th Cir. 2006).

The Court must review all evidence in the light most favorable to the non-moving party. Piazza's Seafood World, 448 F.3d at 752.  Factual controversies are resolved in favor

---

[7] The Court recognizes that "[e]vidence that would not be admissible at trial is not competent evidence to be considered during summary judgment." Fonteneaux v. Shell Oil Co., 289 F. App'x 695, 699 (5th Cir. 2008) (unpubl.) (citing Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 192 (5th Cir. 1991)).  As to the Zayas affidavit, the Court will consider only those parts of the affidavit that would otherwise be admissible at trial.  As to the Rey deposition excerpts, the failure to attach a court reporter's certification – that the copy of the deposition is true and correct – is no mere technical detail.  Indeed, the failure to include such a certification renders the excerpt inadmissible. Refrigeracion Y Restaurante S.A. De C.V. v. Wal-Mart Stores, Inc., 1998 WL 1782541, at *1 (W.D. Tex. July 21, 1998), aff'd, 189 F.3d 469 (5th Cir. 1999) (citing FED. R. CIV. P. 30(f)).  Even if this evidence was considered, the Defendants – for the reasons discussed later – would still be entitled to summary judgment.

of the non-moving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Murungi v. Xavier Univ. of La., 313 Fed. App'x 686, 688 (5th Cir. 2008) (unpubl.) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).  "[I]n the absence of proof," the court cannot "assume that the nonmoving party could or would prove the necessary facts." Little, 37 F. 3d at 1075.  Finally, "a court should not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment." Chacon v. Copeland, 577 Fed. App'x 355, 360 (5th Cir. 2014) (unpubl.) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)) (internal quotations omitted).

Given the multitude of theories asserted by Plaintiff, there is no way to discuss the legal underpinnings of the complaint without addressing each theory separately.  Those foundations are examined below.

### B. Section 1983

As relevant here, 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Id.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144, n. 3 (1979).  To prevail upon a § 1983 claim a plaintiff must establish two elements: (1) a constitutional violation; and (2) that the defendants were legally responsible for the constitutional violation. Johnson v. Dallas Independent School Dist., 38 F.3d 198, 200 (5th Cir. 1994).

12

### C. First Amendment Retaliation

To establish a First Amendment retaliation claim based upon freedom of speech, Fuller must prove: "(1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct." Juarez v. Aguilar, 666 F.3d 325, 332 (5th Cir. 2011).

To establish a First Amendment retaliation claim based upon political association, Fuller must prove that:  (1) he suffered an adverse employment action; (2) he was engaged in politically protected activity; (3) his interest in engaging in the protected activity outweighed the defendant's interest in promoting workplace efficiency; and (4) that the protected activity was a substantial or motivating factor for the adverse employment action. Burnside v. Kaelin, 773 F.3d 624, 626 (5th Cir. 2014).  Beyond these elements, the First Amendment does not protect a "generalized right of social association." City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) (internal quotations omitted).

The non-renewal of an employment contract is an adverse employment action for purposes of a First Amendment retaliation claim. Juarez v. Brownsville Indep. Sch. Dist., No. Civ. B-09-14, 2010 WL 1667788, at *7 (S.D. Tex. Apr. 23, 2010) (unpubl.), aff'd sub nom. Juarez v. Aguilar, 666 F.3d 325 (5th Cir. 2011) (citing Breaux v. City of Garland, 205 F.3d 150, 157 (5th Cir. 2000)).

The Court notes that, on the other hand, the mere placement on paid leave – pending an investigation – is not an adverse employment action. Mora v. Ashcroft, 142 F. App'x 206, 207 n.2 (5th Cir. 2005) (unpubl.); see Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 331 (5th Cir. 2004) (holding that a claim that the employer instituted a "baseless racial harassment investigation" against the employee was not an adverse employment action).

### D. Due Process

"Procedural due process entitles a public employee with a property right in his

employment to notice of the charges against the employee, an explanation of the employer's evidence, and an opportunity to present his side of the story." <u>Fowler v. Smith</u>, 68 F.3d 124, 127 (5th Cir. 1995).  To satisfy constitutional standards, the public employer is required to provide only the minimum protections guaranteed by the United States Constitution.  Thus, if an employer fails to follow its own procedures – and those procedures exceed the federal constitutional minimum – it does not necessarily violate employee's constitutional due process rights.  <u>Levitt v. Univ. of Tex. at El Paso</u>, 759 F.2d 1224, 1229 (5th Cir. 1985).  Instead the question is whether federal due process requirements were met.

A term employee – i.e. an employee who is employed for a specific period of time with no guarantee of renewed employment – has no vested property interest in the renewal of his employment contract, where the employer "merely declined to offer him another year of employment."  <u>Govant v. Houston Cmty. Coll. Sys.</u>, 72 S.W.3d 69, 76 (Tex. App. 2002).  Moreover, an employee's mere unilateral expectation that his contract will be renewed does not implicate a Fourteenth Amendment property interest.  <u>Perry v. Sindermann</u>, 408 U.S. 593, 599 (1972).

**E. Defamation**

"To maintain a defamation action, a plaintiff must prove that the defendant (1) published a statement of fact; (2) that was defamatory concerning the plaintiff; (3) while acting with actual malice regarding the truth of the statement if the plaintiff was a public official or public figure, or while acting with negligence regarding the truth of the statement if the plaintiff was a private individual." <u>Main v. Royall</u>, 348 S.W.3d 381, 389 (Tex. App. 2011).  "A defendant cannot be liable for presenting a true account of events, regardless of what someone may infer from the account." <u>Klentzman v. Brady</u>, 312 S.W.3d 886, 898 (Tex. App. 2009).

**F. Tortious Interference**

"The elements of tortious interference with a contract are (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3)

14

that proximately caused the plaintiff's injury; and (4) caused actual damages or loss." Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000).

### G. Intentional Infliction of Emotional Distress

There are four elements to a claim of intentional infliction of emotional distress: (1) defendant acted intentionally or recklessly; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions caused plaintiff emotional distress; and (4) plaintiff's emotional distress was severe. Twyman v. Twyman, 855 S.W.2d 619, 621–22 (Tex. 1993). This tort, however, is "gap-filler" to be used only when "a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." Hoffmann–La Roche, Inc. v. Zeltwanger, 144 S.W.3d 438, 447 (Tex. 2004). "If the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim." Id, at 448. Thus, if the harms alleged by the plaintiff raise another theory of liability, then the tort of intentional infliction of emotional distress is unavailable, even if the plaintiff did not plead that other theory or did not succeed on the other theory.

### H. Civil Conspiracy

Under Texas law, the essential elements of a civil conspiracy are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." In re Lipsky, 411 S.W.3d 530, 549 (Tex. App. – Fort Worth 2013). The mere existence of a conspiracy is not enough. Instead, the purpose of the conspiracy must be to effect an illegal or unlawful act. See Diaz v. Sw. Wheel, Inc., 736 S.W.2d 770, 774 (Tex. App. 1987), writ denied (Mar. 23, 1988) (a plaintiff cannot sustain a civil conspiracy claim if the defendants conspired to commit a lawful act).

### I. Qualified Immunity

Qualified immunity protects "government officials performing discretionary

15

functions" from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

Qualified immunity is "a defense against an individual capacity lawsuit." Sanders-Burns v. City Of Plano, 594 F.3d 366, 378 (5th Cir. 2010).  " 'Qualified immunity gives government officials breathing room to make reasonable, but mistaken judgments.' " Thompson v. Mercer, 762 F.3d 433, 437 (5th Cir. 2014) (internal citation omitted) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The two-part test for qualified immunity requires the Court to determine: (1) whether defendants' actions violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the defendant's actions. Pearson v. Callahan, 555 U.S. 223 (2009).  "If [the Court] determine[s] that the alleged conduct did not violate a constitutional right, our inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity." Lytle v. Bexar Cty., Tex., 560 F.3d 404, 410 (5th Cir. 2009).

### J. Official Immunity

"Texas law of official immunity is substantially the same as federal qualified immunity." Wren v. Towe, 130 F.3d 1154, 1160 (5th Cir.1997).  "A governmental employee is entitled to official immunity for (1) the performance of discretionary duties (2) that are within the scope of the employee's authority, (3) provided that the employee acts in good faith." Telthorster v. Tennell, 92 S.W.3d 457, 461 (Tex. 2002).

### III. Analysis

At the outset, the Court notes that its role is not to decide whether the decision regarding the non-renewal of Fuller's contract was the best – or even a good – choice; nor is it this Court's role to decide whether the people entrusted to lead the Brownsville

Independent School District put political bickering before the educational needs of students or ahead of the interests of the organization whose purpose it is to educate them.  Rather, the Court's solitary role is to determine if the Defendants acted unlawfully when they chose not to renew Fuller's contract.  For the reasons discussed below, there is no genuine dispute of material fact that Fuller is entitled to relief pursuant to any of the claims he has alleged.  That conclusion leads this Court to recommend that summary judgment be granted in favor of the defendants.

While the individual defendants have pled qualified and official immunity, the Court must first analyze Fuller's claims to see if he has pled sufficient facts warranting a conclusion that Defendants violated his enumerated rights.  In each case, Fuller has failed to do so.  If Fuller fails to submit facts showing the violation of a constitutional right, then the qualified immunity analysis ceases because qualified immunity is unnecessary. Lytle, 560 F.3d at 410.[8] Given Fuller's failure to submit the necessary facts, it is unnecessary for the Court to decide whether the Defendants are entitled to qualified immunity.  The predicate conclusion, i.e. Fuller's failure to show that his rights were violated, is explained in the following sections.

### A. First Amendment Retaliation

Fuller appears to be making two separate, yet inter-related, claims of First Amendment retaliation: (1) exercise of freedom of speech and (2) engaging in political association.  The

---

[8] Because Fuller has not submitted facts to show a violation of his constitutional rights, the question of whether his purported rights were clearly established at the time the Defendants acted is short-lived.  Having said that, if the Court were to consider the question, it would find that the rights, as claimed by Fuller, were not clearly established in situations such as those alleged in this case.  The actions that Fuller complained about occurred in 2010-2012.  It was not until 2016 that the Supreme Court clarified whether a plaintiff had to actually engage in a protected political act to state a First Amendment retaliation claim or whether it was sufficient for the plaintiff's employer to merely believe that the plaintiff engaged in such an act. Heffernan v. City of Paterson, 136 S.Ct. 1412 (2016, slip. op.) (employer's mistaken belief is sufficient), compare, Steadman v. Texas Rangers, 179 F.3d 360, 367 (5th Cir. 1999) (employer's mistaken belief is insufficient).  Given the recency of this determination, the law was not clearly established at the time that the Defendants acted. Combining this state of the law, with the facts otherwise presented, if the Court were required to consider the question of qualified immunity, it would conclude that Defendants are entitled to such immunity.

17

Court will examine each of these claims in turn.

### 1. Freedom of speech

As previously noted, to establish a First Amendment retaliation claim based upon freedom of speech, Fuller must prove four things: (1) an adverse employment action[9] ; (2) speech involving a matter of public concern;  (3) that his interest in speaking outweighed the BISD's interest in promoting efficiency; and, (4) that his speech motivated the adverse employment action. Juarez v. Aguilar, 666 F.3d 325, 332 (5th Cir. 2011).

Fuller claims that he was retaliated against for testifying at Gonzales's grievance hearing.  Even if the Court assumes that Fuller can prove the first three elements, he has plainly failed to submit any evidence, beyond mere speculation and innuendo, to establish the last element, i.e. causation.

During his deposition, Montoya testified under oath that he was unaware that Fuller testified against Gonzales and remained unaware of that fact until the instant case was filed. Dkt. No. 70-5, p. 9.  Indeed, Montoya testified that he had no knowledge  – that Fuller testified during Gonzales's grievance procedure – at the time that he suspended Fuller or when he recommended the non-renewal of Fuller's contract. Id.  Fuller has submitted no evidence showing that any other defendant had knowledge of Fuller's testimony.

Instead, Fuller states that Longoria served as Gonzales's "secretary for many, many years. When I say many, many, anywhere from 10 to 15 years," and then invites the Court to infer that Longoria (1) knew about the testimony and (2) was motivated by the testimony. Dkt. No. 92-1, p. 221; Dkt. No. 92, p. 28 (calling Longoria "a loyal friend to Hector

---

[9]  At the risk of repetition, the Court points out that – that unlike a Due Process claim –  a First Amendment retaliation claim does not require that the plaintiff have a protected property interest in his continued employment. "The absence or presence of a property interest does not affect a First Amendment claim." Wells v. Hico Indep. Sch. Dist., 736 F.2d 243, 248 n. 4 (5th Cir. 1984).  In this case, while the non-renewal of Fuller's non-Chapter 21 contract may have constituted an adverse employment action, Fuller lacked a protected property interest in the renewal of the contract for purposes of the Due Process claim.  This result is further discussed below in considering Fuller's Due Process claim.

Gonzales."). This inference is not the same as actual knowledge. There are no facts in the record showing that Longoria, Presas-Garcia, Escobedo, Saavedra, Atkinson or Montoya: (1) knew about Fuller's testimony against Gonzales; and (2) were motivated to retaliate against him based upon that testimony. This lack of facts is fatal to this claim. <u>Akers v. Hinds Cmty. Coll.</u>, 515 F. App'x 249, 251 (5th Cir. 2012) (unpubl.). Accordingly, summary judgment for the defendants is appropriate as to this theory.

### 2. Political association

As set out earlier, to establish a retaliation claim based on political association, Fuller must prove four things: (1) an adverse employment action; (2) he was engaged in politically protected activity; (3) his interest in engaging in the protected activity outweighed BISD's interest in promoting workplace efficiency; and (4) the protected activity was a substantial or motivating factor for the adverse employment action. <u>Burnside v. Kaelin</u>, 773 F.3d 624, 626 (5th Cir. 2014). Simply establishing three of the four is insufficient to establish a claim. In this case, Fuller has not shown that he engaged in a politically protected activity.

There appears to be no set definition of what constitutes politically protected activity, as it relates to political association claims. The Fifth Circuit has found that membership – or lack thereof – in a political party or organization is protected. <u>Steadman v. Texas Rangers</u>, 179 F.3d 360, 367 (5th Cir. 1999). Supporting or opposing a political candidate is likewise protected. <u>Cox v. Kaelin</u>, 577 Fed. App'x. 306, 312 (5th Cir. 2014) (unpubl.). If the employer mistakenly believes that the employee is engaging in protected activity and retaliates against the employee, those acts can form the basis for liability. <u>Heffernan v. City of Paterson</u>, 136 S.Ct. 1412 (2016, slip. op.). In each case the activity and participation relates to protected political acts.

Fuller, however, does not identify what protected political activity he was involved in. <u>Heffernan</u> is instructive on this point.

In <u>Heffernan</u>, a police officer picked up a yard sign for a mayoral candidate as a favor to his "bedridden" mother; the police officer was not involved in the campaign. <u>Heffernan</u>,

136 S.Ct. at 1412.   His co-workers saw him at the campaign headquarters talking to campaign staff and assumed that he supported the candidate. Id.   As a result, the officer was demoted for his purported support. Id.   The Supreme Court held that the officer could sustain a First Amendment retaliation claim because his supervisors mistakenly believed he had engaged in a protected activity. Id.

Fuller has not identified a protected political activity that he engaged in or that his employer believed that he engaged in.   Instead, he merely states that his "association with those not aligned with Hector Gonzales, Art Rendon, and their allies on the School Board clearly satisfies the first element of this claim." Dkt. No. 92, p. 27.   He has submitted no evidence showing how he associated with these unspecified people or what protected political activity he engaged in with these people.   The First Amendment does not protect a "generalized right of social association." City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) (internal quotations omitted).   Based upon the record before the Court, there is no evidence to show that Fuller's association went beyond a social association.

Furthermore, Fuller has produced no evidence showing that any Defendant believed – mistakenly or otherwise – that Fuller was engaged in a protected political activity.   Unlike the plaintiff in Heffernan, there is no evidence in the record showing that Montoya, Atkinson, Escobedo, Saavedra, Longoria or Presas-Garcia ever believed that Fuller engaged in a politically protected activity.

At its heart, Fuller's complaint is that BISD was run by a small clique of people, who unjustly sought to terminate his employment because they perceived that he was not going to be pliable to their demands. Dkt. No. 92-1, pp. 85-90.   Even assuming that this is true, Fuller has pointed to no evidence that would tend to show that he engaged in a protected political act against any member of this group.   For example, he never publicly opposed their election efforts or endorsed their opponents; he never spoke out or organized opposition. The failure to engage in a protected political act or to show that the Defendants took action against him because they perceived him to be engaging in protected political acts is fatal to his claim.

Thus, Fuller has not submitted evidence showing his involvement in a protected political activity or causation.  Again, summary judgment in the Defendants' favor is appropriate.

**B. Due Process**

As to Fuller's procedural due process claim, he must submit facts showing that: (1) he has a property right in his continued employment; and (2) that he was denied notice of the charges, or denied an explanation of the evidence against him, or denied the opportunity to present his version of the story. Fowler, 68 F.3d at 127.  He has presented no evidence that tends to show the existence of  any of these elements.

The evidence clearly establishes that Fuller did not have a property right in his continued employment.  Fuller was on a yearly contract, which provided no guarantees of future employment.  Indeed, the contract expressly stated that it did not give Fuller "any rights to the procedures required by [Texas] Education Code chapter 21 or to any property rights in employment beyond the contract term." Dkt. No. 69-1, p. 4.  When an employment contract expressly disclaims a property right beyond the contract term, a plaintiff cannot claim a continued property interest in his employment. Hill v. Silsbee Independent School Dist., 103 F.3d 125, *2 (5th Cir. 1996).

Furthermore, even if Fuller did have a property right in his continued employment, this claim still fails.  The uncontroverted evidence shows that Fuller was given notice of his non-renewal and the reasons for that non-renewal. Dkt. No. 70-9 (letter from Montoya to Fuller explaining that he had recommended non-renewal of the contract and the basis for the non-renewal).  Fuller was afforded two opportunities to present his side of the story and argue against the non-renewal, including a hearing before the entire BISD board of trustees. Dkt. No. 92-1, p. 132-138.

To whatever extent Fuller claims that BISD violated its own internal procedures during this process, that claim is legally unavailing.  If a state governmental employer fails to follow internal procedures – and those procedures exceed the federal constitutional

minimum – it is a matter of state law, and does not violate federal constitutional law. Levitt, 759 F.2d at 1229 (5th Cir. 1985).  Fuller has failed to show that the procedure employed in his case failed to meet federal standards.

In sum, there is no genuine dispute of material fact that any of the Defendants violated Fuller's federal constitutional right to procedural due process.[10]  Accordingly, summary judgment as to this theory should be granted in favor of Defendants.

### C. Defamation

As to the defamation claim, Fuller must submit facts showing that a defendant:  (1) published a false statement of fact; (2) that defamed Fuller; (3) "while acting with malice regarding the truth of the statement if the plaintiff was a public official or public figure, or while acting with negligence regarding the truth of the statement if the plaintiff was a private individual." Main, 348 S.W.3d at 389.

Given these elements, the Court first must determine if Fuller was a public official at the time of the allegedly defamatory statements.  "The public official designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." Rosenblatt v. Baer, 383 U.S. 75, 85-86 (1966).  "Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees," then the official in that position is considered a public official for purposes of defamation law. Id.

The CFO of BISD has substantial responsibility over the conduct of government affairs.  BISD has an operational budget of "approximately 500 million" dollars. Dkt. No. 92-1, p. 82.  In his deposition, Fuller agreed that BISD's budget is primarily funded by federal, state and local property tax dollars. Id, pp. 166-167.  Thus, the BISD CFO is

---

[10]  Fuller has not pled any state law claims regarding the purported lack of due process afforded him by BISD.

responsible for allocating and tracking one-half billion dollars in taxpayer funds.  The public clearly would have an independent interest in the performance of this position, irrespective of the identity of the occupant.  See Beck v. Lone Star Broadcasting, Co., 970 S.W.2d 610, 615 (Tex. App. 1998) (holding that the CFO of Tyler Independent School District was a public official under Rosenblatt).  Accordingly, the summary judgment evidence establishes that Fuller was a public official for purposes of defamation law.

This designation then requires Fuller to show that the remaining defendants – Escobedo, Saavedra, Longoria and Presas-Garcia[11] – acted with actual malice when they published the Defenbaugh report.  "Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." Carr v. Brasher, 776 S.W.2d 567, 571 (Tex. 1989).  "Reckless disregard is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id.

Fuller has presented no evidence showing that Escobedo, Saavedra, Longoria or Presas-Garcia had a "high degree of awareness" of the "probable falsity" of the Defenbaugh report.  The basic thrust of Fuller's complaint about the Defenbaugh report is that it omitted "events that are very pertinent to this timeframe" such as Rendon's budgeting actions; Gonzales's lack of reaction to Rendon's actions; and the BISD board overruling Fuller's recommendation as to a banking vendor contract. Dkt. No. 85-1, p. 148-151.  Fuller is essentially asserting that the Defenbaugh audit failed to address all of the issues that arose in the district, ignoring the things that he did well and, instead, largely focused on his mistakes. Id.  That focus does not render the contents of the report false. Klentzman, 312 S.W.3d at 898.

Moreover, Fuller has failed to point out any facts indicating that the statements made

---

[11] All state law claims against Montoya and Atkinson were previously dismissed. Dkt. No. 82.

about him in the Defenbaugh report – such as the bounced checks or the failure to notify the BISD board about the changes in the debt service rules – were false. He further has not pled any facts showing that Escobedo, Saavedra, Longoria or Presas-Garcia knew or should have known that those statements were false.[12]  Accordingly, there is no genuine dispute of material fact and summary judgment in Defendants' favor is appropriate for this claim.

### D. Tortious Interference

As previously noted, the elements of tortious interference with a contract are (1) an existing contract; (2) intentional interference; (3) proximate cause and (4) actual damages. Prudential Ins. Co. of Am., 29 S.W.3d at 77.  Fuller has pointed to no evidence that would support all four elements of this claim. See Piazza, 448 F.3d at 752 (noting that summary judgment is appropriate when the non-movant is unable to show a genuine dispute of material fact for an element of his claim).

"To establish the element of an act of willful and intentional interference, the plaintiff must produce some evidence that the defendant was more than a willing participant and knowingly induced one of the contracting parties to breach its obligations under the contract." Stroud Prod., L.L.C. v. Hosford, 405 S.W.3d 794, 820 (Tex. App. 2013).  For the reasons discussed below, summary judgment in Defendants' favor is appropriate because Fuller has not shown that his contract was breached.

Under the express terms of Fuller's contract, BISD could suspend him at any time with full pay and benefits. Dkt. No. 69-1, p. 3 ("The District may suspend the Employee,

---

[12] There is a one-year statute of limitations for defamation claims that begins to run on the date of publication. Pitts & Collard, L.L.P. v. Schechter, 369 S.W.3d 301, 323 (Tex. App.–Houston [1 Dist.] 2011).  The Defenbaugh report was given to the Brownsville Herald on February 15, 2012; Fuller did not file suit until in June 7, 2013. Dkt. No. 1.

When a defendant fails to raise the affirmative defense of limitations in its answer, the defense is waived "and may not be raised sua sponte." Lebouef v. Island Operating Co., 342 F. App'x 983, 984 (5th Cir. 2009) (unpubl.) (citing Eriline Co. v. Johnson, 440 F.3d 648, 657 (4th Cir. 2006)).  The Defendants did not raise the affirmative defense of the statute of limitations period in their answer. Dkt. No. 32.  Accordingly, the Court will not consider whether Fuller's defamation claims were untimely filed.

with pay, at any time during this Contract at the District's sole discretion."). When Fuller was suspended, he was given his full pay and benefits for the remainder of the contract and does not argue otherwise. Dkt. No. 92-1, p. 111. Furthermore, Fuller's contract expressly disclaimed any future property interest. Dkt. No. 69-1, p. 4. Thus, none of the defendants caused any party to breach the employment contract, because by its own terms the contract was not breached. As such, no defendant interfered with the contract.

Given this fact, there is no genuine dispute of material fact as to this claim and summary judgment is appropriate.

### E. Intentional Infliction of Emotional Distress

As set forth earlier, a plaintiff must establish four elements to prove a claim of intentional infliction of emotional distress: (1) defendant acted intentionally or recklessly; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions caused plaintiff emotional distress; and (4) plaintiff's emotional distress was severe. Twyman, 855 S.W.2d at 621–22. Also as indicated earlier, this tort is "gap-filler" – to be used only when no other cause of actions provides a theory of recovery for the mental injury. Hoffmann–La Roche, Inc. v. Zeltwanger, 144 S.W.3d at 447. If there are any other theories of redress available, then the intentional infliction of emotional distress is unavailable. Id. "If the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim." Id, at 448.

The gravamen of Fuller's complaint against the Defendants is retaliation and defamation: that the Defendants conspired against him because he was not politically aligned with them; that they set out to ruin Fuller's good name; and that they acted to give the BISD board a pretextual reason to not renew its contract with him. Fuller's complaint lies within the torts he has already claimed in this case. The fact that he cannot prove these other torts has no effect upon preclusion; the legal theories of these other torts – such as defamation, retaliation, and tortious interference with a contract – have the preclusive effect, regardless

25

of Fuller's ability to prove those theories.  To permit the intentional infliction of emotional distress claim to proceed in this situation, would be contrary to Texas law, as set forth in Zeltwanger.

Even if Fuller were permitted to proceed on this claim, he has not identified any "extreme and outrageous conduct" on the part of any defendant.  Just labeling conduct in this fashion does not make it such. See Haynes & Boone, L.L.P. v. Chason, 81 S.W.3d 307, 309-10 (Tex. App. 2001) (noting that courts "must determine as a threshold matter whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.").  Merely malicious conduct does not meet this standard; rather, the "conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id, at 309.  Fuller has not identified any conduct which meets this demanding standard.  Thus, summary judgment in Defendants' favor is appropriate for this claim.

**F. Civil Conspiracy**

Under Texas law, the essential elements of a civil conspiracy are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." In re Lipsky, 411 S.W.3d at 549.

Fuller must submit clear and specific facts to show that Escobedo, Saavedra, Presas-Garcia and Longoria "agreed on the objective," which was to commit a tort against Fuller. Lipsky, 411 S.W.3d at 552.  There has been no evidence submitted, beyond fact-free suppositions by Fuller and Zayas to show any meeting of the minds between any of those defendants. Without the showing of both: (1) a tort and (2) the specific intent by the conspirators to engage in that tort, Fuller's claim fails. Cotten v. Weatherford Bancshares, Inc., 187 S.W.3d 687, 701 (Tex. App.-Fort Worth 2006, pet. denied).

Even if Fuller could show that Escobedo, Saavedra, Presas-Garcia and Longoria conspired against him, he has not shown that the conspiracy centered upon an illegal act.  A

plaintiff cannot sustain a claim of civil conspiracy if the conspirators worked in concert to commit a legal act. <u>Diaz</u>, 736 S.W.2d at 774.   Accordingly, summary judgment is appropriate.

## IV.  Recommendation

WHEREFORE it is **RECOMMENDED** that the motions for summary judgment filed by Brownsville Independent School District, Catalina Presas-Garcia, Lucy Longoria, Christina Saavedra, Enrique Escobedo, Sylvia Atkinson, and Carl Montoya be granted. Dkt. Nos. 68, 70.  It is further recommended that the Court enter a judgment that Fred A. Fuller take nothing and that each party shall bear its own costs and fees.

### A.  Notice to Parties

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Andrew S. Hanen, United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009).  Failure to file objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. <u>See</u> § 636(b)(1); <u>Thomas v Arn</u>, 474 U.S. 140, 149 (1985); <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1428-29 (5th Cir. 1996), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

DONE at Brownsville, Texas on May 18, 2016.

Ronald G. Morgan
United States Magistrate Judge